Good morning, Your Honors. May it please the Court, this is Shook for Mr. Oppelt, and I'd like to reserve four minutes for rebuttal, if I may. I'll help you. As the Court knows, in this case, the State failed to prosecute Mr. Oppelt for six years after the investigation against him was complete, and that lengthy delay was caused solely by the State's negligence, during which time a key witness for the prosecution developed a condition that caused memory loss. And I'd like to correct it. There's an errata in the petitioner's brief that says hyperthyroidism. In fact, it's hypothyroidism. Habeas relief is warranted here because although the State Supreme Court essentially asked the right question, are the fundamental conceptions of justice violated by allowing the prosecution to go forward? And the Court correctly found actual prejudice to Mr. Oppelt resulting from the delay. Its conclusion that his due process rights were not violated by the prosecution was an unreasonable application of clearly established federal law because the Court improperly balanced the relevant circumstances and failed to consider the significant length of the negligent delay in that balancing. And how, by what standard of review do we look at that determination? Well, you're looking at it through EDPA 2254-D, which requires the unreasonable application. Objectively unreasonable application. Objectively unreasonable. That's correct. As I understand, we have LAVOSCO that states that any delay undertaken by the government solely to gain a tactical advantage triggers a due process violation. But the Supreme Court has never addressed what about mere negligence in failing to file the charges. Is that right? Yes. In LAVOSCO, what you just noted, the quote from them about the fact that a tactical delay, it was restating the government's own concession on that point. And there's no evidence here that it was deliberately done for tactical purpose? No, there is no evidence here. It seems to have slipped through the cracks. And then as I understand it, we have a couple of Ninth Circuit cases that recognize that negligence can trigger a due process violation. And the Washington Supreme Court cited to those Ninth Circuit cases and discussed the application of negligence to this set of facts and concluded that on this record, it did not establish a due process violation. So how can we declare that that is an objectively unreasonable application of Supreme Court authority when the Washington Supreme Court went even further than the U.S. Supreme Court has done in reliance on Ninth Circuit authority, but concluded that there was no constitutional violation? Well, with respect, I know that the other circuits have required the tactical standard to be met. In Levasco itself, it states that the fundamental distinction between investigative delay and tactical delay is precisely because investigative delay is not so one-sided. And I would submit that negligence on the part of the state in failing to prosecute a case is exactly one-sided. So I, although Levasco... So you want a per se rule? You want a rule that says that any time negligence is shown, that constitutes a due process violation? No, Your Honor. Levasco clearly states that prejudice must also be established. And didn't the Washington Supreme Court address the prejudice prong as well? What the Washington Supreme Court did was it found that there was prejudice to Mr. Oppelt resulting from the memory loss of the witness, Berta Olson. What it failed to take into account, and which this Court has correctly noted, is that the length of the delay is another relevant circumstance in evaluating the due process violation. Well, I'm not quite sure that accurately characterizes what the Washington Supreme Court did. It adopted a balancing test that addressed a number of factors. The reasons for delay are balanced with the prejudice to the defendant. The state's interest is balanced with prejudice to the defendant. And the delay is balanced with prejudice. I'm sorry, I missed. It's a balancing test. And then they articulated factors, actual prejudice from delay, the reasons for the delay, the reasons and prejudice to determine whether fundamental conceptions of justice would be violated. And in applying all that test to this fact, they concluded that there was no due process violation. So they did articulate a test, as you say. They went through and articulated a test that establishes that there is balancing to be done. In evaluating Mr. Oppelt's claim, they looked first to was there prejudice, since that's a threshold requirement for even considering any of the other factors. Then they looked and said, what caused the prejudice? And here there was no contest that it was the state's negligence. Oh, sorry, what caused the delay? And that there was no contest that this was a negligent delay. And then they looked back to Mr. Oppelt and said, well, now you need to show more prejudice. And I believe that what they're missing from that consideration is that this wasn't a delay, as in Levasko, of a mere 17 months. This was a six-year delay. And that this Court has recognized in cases such as Moran, United States v. Moran, that the length of the delay is relevant to looking at the amount of prejudice that a defendant is going to have to show in order to establish due process violation. And you found any case where there was negligent delay and the Court found that there was prejudice and therefore reversed a conviction? Well, they are few and far between. The Fourth Circuit case in Howell v. Barker, which is cited in the brief, is from 1990. And it has exactly that. It was a negligent delay on the part of the state in prosecuting the defendant. And he showed that there was prejudice and the Court said that was enough and that that sufficed. In most of these cases, the defendants appear to be unable to establish actual prejudice. And or it's a situation such as in the Who v. United States case that the state cites the denial or dissent from denial of cert in which, when you look at the underlying case there, it appeared to involve an investigatory delay, which Levasco suggests you would have to show either an extreme amount of prejudice or we're not really sure about what, you know, in that instance. How do you establish the standard that's required if you have no Ninth Circuit case, let alone a Supreme Court decision that says, essentially, it is clearly established that negligent delay for a period that obviously doesn't exceed the statute of limitations is a basis for dismissal? Well, I believe that you look back to what Levasco said, which the Court there recognized that it was leaving to the lower courts the task of applying, as it put it, the settled principles of due process to the circumstances of each individual case. And why didn't that happen here with the Washington Supreme Court's articulation of this new test and then applying balancing in order to determine whether you've got a fundamentally fair trial? Well, I believe that what was missing from the Supreme Court's evaluation of the due process test was the fact that this was an extraordinarily long, unjustified delay. But they included that as a factor and talked about it, didn't they? No, they did not. At the very beginning of the opinion, it states that there was a six-year delay. But when you go to where the Court is doing the balancing, what it says is, okay, there's some prejudice. We find that there was prejudice. We find that this was negligent. I think they said it was slight prejudice. Yes, very slight prejudice. That's their characterization of it. Page 12 of their opinion. Yes. That's what they said. That's how they characterized the prejudice. Okay. The prejudice here is the loss of the witness? The prejudice here is that Berta Olson, who was A.R.'s great-grandmother, developed in the interim between 2001 and the time that Mr. Appel was charged and ultimately tried, developed this condition of hypothyroidism that impaired her memory. And she had, at the time of disclosure by A.R., she had either given to or applied herself a lotion to A.R. And she didn't recall. So that happened. Then A.R. was taken to see nurses who reported that they saw redness and swelling and then testified to the fact that they saw redness and swelling. And the state used that in the prosecution to argue, in its closing, says, there's no other evidence of anything else that would have caused the redness and swelling. Therefore, there's medical evidence that supports A.R.'s allegations. So it was corroborating evidence in what was otherwise a he said, she said case. Well, on page 12, I'm quoting from the state Supreme Court's opinion. The defendant was not precluded from arguing that the lotion might have caused redness and swelling and no other memory issues were identified as specifically problematic. So, I mean, they're basically saying the prejudice claim turns on the identity of the lotion, not whether or not it might have explained the redness as opposed to something more forcible. Well, the redness was you. Sorry, let me answer. Sure. You know, I believe impeaching Ms. Olson as to her memory loss is different than being able to affirmatively say you applied this lotion, didn't you? This lotion could have caused, you know, this is the type of lotion that would have caused redness. And that's what the trial for. But the nurse testified that there were some lotions that could, right? Again, right, yes. It was brought out by the defense that there were other things might have caused what they observed. But as I said, the prosecution in its closing at ER 599 to 602 specifically states there is no evidence of any other thing happening that would have caused the redness and swelling. But there is evidence that the defendants caused it. So there is medical evidence supporting what AR said. I mean, the problem is, depending on the other evidence in the case, there are two explanations for the redness. One is sexual misconduct by your client. The other is, depending on the type of lotion, a lotion. Those are the only two choices, right? Correct. Correct. Well, as the trial court stated that this was the trial court's finding at the pre-trial hearing at which this motion to dismiss was originally made, you know, that they are precluded, the defense is precluded from making a specific argument that we know it's this type of lotion and this type of lotion would definitely cause the redness. And that's just taking that issue and having it be resolved. The defense at this point is precluded from any certainty with respect to that. And clearly we have a key witness whose memory is compromised. And then the State Court of Appeals also noted that, concluded that Bertha would have testified closer in time to 2001 that the lotion was not, as she said, Vagisil, but something else, is not speculation but a reasonable probability. Okay. So I think you... You wanted to reserve some time. Oh, yes. Thank you. You're welcome. Let's hear from the State. Good morning. May it please the Court. My name is Paul Weiser. I'm an Assistant Attorney General representing Appellee Glebe in this matter. There's no dispute that the six-year delay in the charging in Mr. Opal's case was due to the State's negligence, but there's also no dispute that it was anything, that there was nothing more than negligence in this case. The Washington Supreme Court's decision in this case rejecting Opal's due process claim is entitled to deference for at least two reasons. First, under a clearly established United States Supreme Court precedent, negligence in the pre-charging delay does not trigger the due process analysis of United States v. Lubosco. And even if negligent delay does trigger the due process analysis, Mr. Opal's showing of actual prejudice was insufficient, and for those reasons the district court's judgment should be affirmed. Now, the clearly established federal law in this area, as this Court has already discussed, is relatively narrow, and it stems from just a handful of cases, mainly United States v. Lubosco, Marion, and also the Gouveia case. And under that standard, the requirement of showing actual prejudice is an ironclad requirement. But the Court has also made it clear that motive or intent behind the delay is also an important element, and that some types of intentional delay are more reasonable or defensible than others. For example, investigative delay. But that was part of the Court's holding, the fact that there had to be a motive on the prosecutor's part before it would trigger the due process analysis. That was part of Lubosco when the Court said, we therefore hold that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time. And the reasons for that stems from such cases as Justice Brennan's concurrence in the Dickey v. Florida case, which is cited in one of the footnotes of Lubosco. It was not cited in our brief. But it pointed out that the rationale behind this was that deliberate governmental delay designed to harm the accused constitutes an abuse of the criminal process. And that ties in with what the Court said in Lubosco about whether the delay violates the community's sense of fair play and decency and fundamental conceptions of justice. So in all of those holdings and the discussions by the Court, they go to purposeful, intentional conduct on the part of the state, not mere negligence. And in cases involving negligence, there's no gamesmanship involved by the prosecutor. So the Washington Supreme Court would have been authorized, under clearly established federal law, to say this case does not involve anything more than negligence on the prosecution's part. Sorry, Mr. Alport, you have not even triggered the due process analysis. They gave him the benefit of this Court's holdings, though, and the holdings of the Fourth Circuit in the Barker v. Howell case and adopted that reasoning and said, we will extend this test to cases involving negligent delay, and analyzed his case for actual prejudice under that standard. Nothing in Lubosco compelled the Washington Supreme Court to conduct that due process analysis, but they did it nevertheless. But even if Lubosco applies under the facts of Mr. Alport's case, his showing of prejudice, actual prejudice, was insufficient. And it's important to remember that he did not lose any defense evidence. We're talking about Bertha Olson's testimony here. That's the only person who's been involved in the allegations of actual prejudice. And she was a state's witness. Well, the one thing he lost was a better memory on her part of exactly what brand of lotion she applied. And depending upon what her memory was on that issue, it might or might not have helped Mr. Opelt, depending on what her answer would have been. But she doesn't remember now. Yes, Your Honor, and that's the exclusive, that's the parameters of what it is that Mr. Opelt allegedly lost here. Do we know how long her memory lasts? No, Your Honor. She was not questioned about the identity of the lotion at the time of the report back in 2001. She even prepared a written statement for the police. I think she may have mentioned something about lotion there, but I don't think that she specified the brand name of the lotion that she used. And I don't believe she was asked a question about that by either the nurse practitioner who examined AR in May of 2001, nor was she asked that question by the police in May 2001. Apparently never dawned on anybody to ask her that question. So we don't know what her memory would have been in 2001 or 2002 of what lotion she provided to AR. We do know, though, what she said in 2007, or rather 2008 at the time of trial. If you look at her testimony, there really was no serious memory loss. At several points in her testimony, and all of her testimony is in Volume 3 of the excerpts of record, page 333, it was Vagisil. Then a cross-examination at page 366. I remember giving her Vagisil because I knew it wouldn't harm her. It wouldn't irritate it. Then again at 377, I've had a long time to think about it, and I'm sure that it was Vagisil. Now, I realize that the defense was able to challenge that and was able to make that a theme of their cross-examination. But the whole point of the defense, or one of the main objectives of the defense, was to discredit Bertha Olson as a state's witness. She was the first person to whom AR had made the report of the abuse, so it was important to do something to discredit her. This memory loss, or the purported memory loss, did not impair the defense. It provided the defense an opportunity to attack the state's case. So I take it the suggestion was she was just being overly helpful six years later to the prosecution because she then knew that the brand of lotion was important. That's correct, Your Honor. I think the defense brought out that during an interview, a pretrial interview with the defense attorneys, that Bertha had forgotten or said it was probably Vagisil. She was not as specific as she later was at trial or appeared to be at trial. So the defense was able to pursue that, and they did quite well in their cross-examination of her. And then also in closing argument, they were able to make an issue out of Bertha's purported memory loss. This came to light. The thing that sort of brought the case back to the surface was when a Child Protective Service officer, personnel of some kind, found the file or had been contacted by the family. Is that roughly right? Yes, Your Honor. I think that's probably as close as we will get to what the scenario was. I don't know the record is abundantly clear on that, but it appears that it was that. Several years later, a Child Protective Services person expressed some concern to somebody in the prosecutor's office. The prosecutor said, we have no record of that case, and that's when they backtracked and they were able to locate the investigative files. So that is correct. Any indication in the record as to why it took that long for even CPS to notice that something hadn't happened? There is not, Your Honor. Regrettably, that part of the record was not developed. Was this a new referral to CPS on new allegations that triggered the inquiry by DSHS as opposed to the Everett Police Department? You're referring to the 2007? Yes. And again, on that, the record is not clear exactly what it is that triggered the question from the CPS worker to the prosecutor. And was there a referral to CPS by the Everett Police Department at the time that Detective Jensen did the initial investigation? Yes, there was, Your Honor. In 2001, there was a referral, and I believe that, believe it or not, the investigation was cleared. I think the CPS found that the allegations were unfounded in 2001. I don't think that that necessarily relates to the failure of the police department to have its file at the prosecutor's office or the prosecutor's loss of the file. As I understand it, I assume from what I read of the record, Detective Jensen finishes his follow-up investigation and then he refers the charging packet to the Snohomish County Prosecuting Attorney's Office, and we don't know why, but it got lost for six years. That's correct. And it's not found again until six years later, a different DSHS investigator from CPS calls the prosecutor's office and inquires as to whether they have any cases involving this. Yes, and I'm not sure, Your Honor, that it was the CPS worker calling the prosecutor and questioning about this precise case. It may have been something that came up in conversation where she was. Do you have anything open on this guy? I think it might be something on that nature. Okay. It's just not abundantly clear. Okay. But as the Court has pointed out, the Washington Supreme Court found only very slight prejudice on this record, and that's an interesting use of that modifier, very slight prejudice. They wanted to do as much as possible to show that this was truly trivial in the grand scheme of things. It's true that the trial court found prejudice, but it did so in the pretrial context where it was trying to predict whether Opelt would be able to get a fair trial. Washington Supreme Court, though, had the benefit of the entire record, as does this court, including the cross-examination and testimony of Bertha Olson as well as the closing argument by the defense. Mr. Weiser, is that a factual finding to which AEDPA requires that we defer unless Mr. Opelt can convince us by clear and convincing evidence that it's wrong? I believe it is, Your Honor. I believe to some extent it is a finding of fact. I realize it's a mixed question of law and fact. To the extent that it is a finding of fact, it would be binding on this Court under Section 2254E1, and I believe it would also be subject to Section 2254D2 because it would be a reasonable termination in light of the evidence presented in the state court proceedings. So to that extent, I believe it is binding on this Court. The record is clear, though, that Mr. Opelt received a fair trial. That's the ultimate question under the Due Process Clause in cases of pre-charging delay. Washington Supreme Court reasonably determined that Opelt's trial was fair despite the pre-charging delay, and we would ask that this Court affirm the district court's judgment of dismissal. Thank you. Thank you. Anybody have anything further? I think not. Ms. Schuch, I think you've got a little bit of time left. I just wanted to address a couple of things. With regard to CPS, I don't believe that AR was living with Mr. Opelt at the time in 2007. I believe she was living elsewhere. We have no idea why CPS would be, six years later, making inquiry of this. The record, as counsel mentioned, is very unclear on this. It appears someone called CPS and said what happened with this case, and that's what prompted them to call the prosecutor. As the State noted, CPS did do an investigation at the time that the allegations were made, and at least according to the Court of Appeals decision, there's a footnote that says that initially concluded the allegations against him were founded. However, it subsequently reversed that decision and, in fact, allowed AR to return to his home. So was she removed from the home originally? Well, she was not actually living there. Well, actually, he was arrested, right? No, I guess he was not, because he was never charged. Right. The record's a bit confusing. She was actually living with her great-grandparents. She lived with her great-grandparents at the time. That's right, because they were on a trip to North Dakota, and they left her with— With her mother, to whom Mr. Opelt was married for the week and a half. So she actually, after the allegations were made, she was living with Berta and her then-husband Floyd. She was actually removed from their home because allegations came out that Floyd was accused by other female family members of having molested them as children. And, in fact, he had picked AR up by himself from Mr. Opelt's house the day that the allegations were made. So was that a defense suggestion that perhaps he had been the one who abused her? That's correct, and that was found to be overly— the trial court, in considering our defense arguments as to prejudice, found that that was overly speculative. He was apparently—it's unclear where Floyd was at the time of trial, but Detective Jensen acknowledged at the time of trial that it was an oversight on his part to not interview Mr. Olson, given the allegations. And then I just wanted to touch on— I believe that the finding, the state court's determination that it was slight prejudice to Mr. Opelt is a mixed question, and therefore is not accorded the same deference. But the findings of fact are Berta Olson lost her memory and couldn't recall it, but the determination that it was prejudice is a question of law. I think Mr. Wieser acknowledged that. Thank you both very much. Thank you. Very well argued. The case just argued is submitted. The last case on the calendar, United States v. Dunkel, is submitted, and we are adjourned.
judges: Whyte, Hawkins, Tallman